DEPOSIT GUAR. BANK & TRUST Co. *v.* J. F. WEAVER LBR. Co., et al.

Oct. 20, 1952

No. 38468 4 Adv. S. 4 60 So. 2d 598

*Henley, Jones & Woodliff,* for appellant.

*Chambers, Trenhom & Smith,* for appellee Lumber Company.

*Creekmore & Beacham,* for appellee Weston Lumber & Wrecking Company.

*Leon Shelton,* for appellees National Economy Plumbers and J. W. Moore.

*Agnew & Slaymaker,* for appellees Lula Belle and Willis McKinney.

Lee, J.

J. F. Weaver Lumber Company and others, who furnished materials for the construction of a house, as plaintiffs, brought this suit against Lula Belle McKinney and husband, Willis McKinney, as owners, W. H. Black, as contractor, and Deposit Guaranty Bank & Trust Company and its trustee, as lien holders, to recover funds which were alleged to have been bound in the hands of the owners, as the result of notice under Section 372, Code of 1942. From the judgment rendered, the bank appeals.

Lula Belle McKinney owned a lot in the City of Jackson. She and her husband, Willis McKinney, contracted on October 15, 1949, with W. H. Black to erect a 3-bedroom house on said lot for a consideration of $3,987.40. A down payment of $500 was made immediately thereafter. It was contemplated that an F.H.A. loan would be obtained. Construction was commenced shortly after the execution of the contract. On January 12, 1950, the McKinneys made an additional payment of $600 from the proceeds of a loan which was obtained from the bank. As security, they executed a deed of trust on the lot in question. This instrument secured also "such future and additional advances as may be made to the grantors, or either of them, by the beneficiary in a sum not exceeding $100,000.00. . . ." It also contained this provision: "This deed of trust is to cover any and all further advances made to W. H. Black or grantors herein for use by W. H. Black in construction of a residence on the hereinabove described property." In addition to the description of the lot in the proper subdivision, it was further described as the identical property purchased by Lula Belle McKinney from Mary Jane Beacham. The accompanying note was signed by both the McKinneys and Black.

Between January 27 and May 19, 1950, the bank advanced $2,550 to Black. The manner of this operation

was as follows: Black would go to the bank to get his payroll. A note would be prepared for the amount. He would carry it out, and subsequently return with his name and those of Lula Belle and Willis thereon, and the bank would then give him the money. There were eleven of these notes. At sometime during those transactions, he delivered to the bank an instrument of the following tenor:

"JACKSON, MISSISSIPPI
December 15, 1949

TO WHOM IT MAY CONCERN:
This is to certify that W. H. Black at his option and in accordance with the contract may sign my name on any and all loans within 80% on completion of the building.

(signature) Lula Belle McKinney
OWNER."

Lula Belle denied that she signed any of the eleven notes, and Black admitted that he himself put her name on all of them. However, they show on their face that he did not sign her name as agent. Willis signed all but three of the notes, but, according to his evidence, he did so on the understanding that Black was also to get the signature of his wife.

Lula Belle denied that she signed the alleged power of attorney, set out above, and in this, she was corroborated by her husband. As a matter of fact, it was not directed to the bank and according to its date, if Lula Belle signed it, she did so almost a month before the execution of the note and deed of trust to the bank. On the contrary, Black testified that she did sign it. A bank employee, who qualified as an expert in handwriting, testified that her signature on the instrument was genuine. However, on cross-examination, the weight of his evidence was somewhat discredited. (Hn 1) An employee of appellant, as an expert in handwriting, also testified that the signature was genuine. The court excluded his

evidence on the ground that he was appellant's employee. This evidence was admissible, although it might have been worth less than that of a nonemployee. However, it was merely cumulative, and its exclusion, under the circumstances, was not harmful. The judge, sitting as both judge and jury, saw these witnesses and observed their demeanor, and it cannot be said that his finding was manifestly wrong.

Hence, the case here must be viewed in the following light: Lula Belle, the actual owner of the lot, did not sign the notes on account of which the bank paid the money to Black, and did not authorize Black to sign her name thereto. So far as she is concerned, the bank paid out the money without her authorization.

But the bank contends that it was empowered to pay the money to Black under the two quoted provisions of the deed of trust, supra.

(Hn 2) The first quotation is a part of a printed form in general use. The second was written into the body of the instrument. It dealt specifically with this particular contract, and was superimposed upon the former. Generally, the instrument secured future and additional advances to the "grantors, or either of them". But so far as this particular transaction was concerned the instrument covered advances made to Black or Lula Belle McKinney and Willis McKinney for use by Black in construction of the residence. By its terms, Lula Belle and Willis were responsible for such advances as the bank might make to them for the purpose of paying Black for the construction, or such advances as it made to Black which went into the construction.

Since advances were made by the bank only to Black, the inquiry, under the rule stated in Weiss, Dreyfous and Seiferth v. Natchez Investment Co., 166 Miss. 253, 140 So. 736, and First National Bank of Greenville v. Virden, 208 Miss. 679, 45 So. 2d 268, was, how much of such advances went into the construction of the house, and, therefore, became payments on the contract price?

(Hn 3) The owners here were liable to the materialmen only for the remaining unpaid contract price in their hands at the time of notice. Section 372, Code of 1942; Chancellor v. Melvin, 52 So. 2d 366, and authorities there cited. The problem thus posed was, how much of the contract price remained unpaid when the owners received the notice?

(Hn 4) The trial court held that the bank's lien was good only for $600, less payments thereon, and for $700, the aggregate of advances made to Black after the McKinneys knew, by notice from the bank, that he was executing their notes, and the payment of which they did not protest. This conclusion rested on his finding that only $1,300 of the bank's advances actually went into the house. With one witness testifying that it would require $564 to complete the house, while another estimated it at $950, the court held that $750 would be necessary for that purpose. The court, after scaling down the bank's lien, as above stated, credited the McKinneys with the amount which they had paid and the amount necessary for the completion of the house, and prorated the residue of $1,437.40 to the accounts of the several claimants.

On these several issues, the evidence was conflicting. It is elemental that this Court will not reverse findings under those circumstances, unless they are manifestly wrong.

The bank took no precautions to see that its advances were actually put into the construction of the house. While Weiss, Dreyfous and Seiferth v. Natchez Investment Co. and First National Bank of Greenville v. Virden, supra, grew out of efforts to enforce liens, and the relief sought here was to bind the unpaid contract price in the hands of the owners, those cases are applicable and very helpful here. After all, there is great similarity in making a determination as to whether liens were subsisting in those cases, and whether funds were bound in this case.

.Appellant also contends that the pleadings and proof show that the McKinneys were not indebted to Black at the time of the notice.

The answer of the McKinneys, in effect, stated these facts: The bank advanced Black $2,550 on notes which he tendered, but they neither executed nor authorized such notes. If they were liable on that account and were required to complete the house, they would overpay the contract price. If they were not liable on account of the notes, they would owe a balance of about $1,500. Black testified that he had been paid the full amount of his contract. Obviously, he had been overpaid for what he did, and that fact was doubtless the reason for his statement. Lula Belle denied her liability on the notes and contended that she did not owe Black anything. Her contention that she was not indebted to Black evidently stemmed from the fact that, since she did not authorize the execution of the notes, and, therefore, did not owe the bank for its advances, she had become liable to the materialmen; and when this was combined with the amount necessary to complete the house, there could be no basis on which she would owe Black anything. Thus, the answer and proof were not inconsistent and did not show that the contract price had been fully paid.

Appellant. further contends that, since the total payments made by the McKinneys and the bank exceeded the contract price at the time of the delivery of the notice, the debt of the owners to the contractor was extinguished.

(Hn 5) Of course, if a debtor ratifies the payment of his debt by a stranger, the debt is discharged and he becomes liable to the stranger. "But if the debtor refuses to ratify, he disclaims the payment and the debt stands unpaid as to him; and he may not be held liable for the money paid." 40 Am. Jur., Payment, Section 22, p. 726.

In Chancellor v. Melvin, supra, most of the contract price had been paid by virtue of funds obtained from notes which had been signed by Melvin. The opinion

cited Smith v. Merriam and Pinkerton, 67 Barb. N. Y. 403, a case where the owner, in defense of a suit by materialmen, was allowed credit for money which the contractor obtained from notes, which the owner had endorsed.

In the case here, Lula Belle neither signed the notes nor ratified the payment by the bank to Black. Consequently, the bank's advances to Black, under such circumstances, were not effectual to exonerate the McKinneys from liability for that part of such advances which were not used in the construction of the house.

Due consideration has been given to the several errors assigned by the appellant. In our opinion, the learned trial judge, under the facts in this record, was amply justified in reaching the conclusion at which he arrived, and for that reason, the judgment ought to be, and is, affirmed.

Affirmed.

*McGehee, C. J.*, and *Hall, Arrington* and *Ethridge, JJ.*, concur.